PRESENT: ALL THE JUSTICES

THE CITY OF SUFFOLK EX REL.
STEVE HERBERT, ZONING ADMINISTRATOR
FOR THE CITY OF SUFFOLK, ET AL.
                                              OPINION BY
v.   Record No. 021981              JUSTICE G. STEVEN AGEE
                                              JUNE 6, 2003
BOARD OF ZONING APPEALS FOR
THE CITY OF SUFFOLK, ET AL.


            FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
                       Rodham T. Delk, Jr., Judge

     The City of Suffolk ("the City") appeals the judgment of

the Circuit Court of the City of Suffolk affirming the

determination of the Board of Zoning Appeals for the City of

Suffolk ("BZA") that certain land use rights became vested with

respect to a parcel of land owned by Etheridge Manor Corporation

("Etheridge").  For the reasons set forth below, we will affirm

the trial court's judgment.

                    I.  FACTS AND PROCEEDINGS BELOW

     In 1985, Etheridge purchased a tract of approximately 164

acres in the City of Suffolk ("the Property").  In conjunction

with an adjoining landowner, Etheridge planned to develop the

combined tracts of 310 acres as a planned unit development known

as King's Landing.  In June 1988, at the request of Etheridge

and the adjoining landowner, the Suffolk City Council rezoned

the 310 acres from "Rural Residential" to "Planned Development

Housing" ("PD-H") and approved the Master Land Use Plan

Etheridge submitted for the development.  The Master Land Use

Plan reflected a mixed-use and mixed-density development

including medium and high-density residential areas, as well as

commercial parcels.

The adjoining landowner encountered financial difficulties,

including foreclosure, which delayed a joint development of the

project.  Etheridge decided to proceed independently and engaged

an engineering firm to review the development options for the

Property in 1993.

In 1994, Etheridge requested that approximately 10 acres of

the Property be rezoned from "PD-H" to "General Business."  At

the same time, Etheridge submitted amendments to the 1988 Master

Land Use Plan to change the proposed residential development

areas from mixed density to low density for the remaining 154

acres of the Property.  In August 1994, the Suffolk City Council

approved the rezoning of the 10-acre parcel, reduced the density

for the remaining 154 acres to four units per acre, and approved

the Amended Master Land Use Plan.[1]

---

[1] The 1988 Master Land Use Plan, and the 1994 amended
version, which continued to identify the project as King's
Landing, show the general location of primary roads, recreation
areas, waterways, and entrances to state highways.  Neither plan
contained specific details as to lot locations, curb, gutter,
utilities, residential streets, or storm drainage facilities.
The rezonings and land use plans did fix the number of available
residential units on the Property.

In 1995, Etheridge submitted a preliminary recreation plan and a traffic impact analysis based on a full residential development of the Property, which the City approved. In 1996, Etheridge submitted a preliminary subdivision plat for part of the remaining 154 acres of the Property (designated as "Planter's Station at King's Landing Section 1, 2 and 3" ("Planter's Station")).[2] The Suffolk Planning Commission approved this preliminary plat in March 1996, and granted extensions of time for submission of the final Planter's Station plat to April 1998. The extensions were requested to accommodate the engineering design for the entire Property relating to sewer, water, storm drainage, and related items since the Planter's Station portion was part of an integrated infrastructure for the whole Property.

In 1997, Etheridge deeded 1.1 acres of the Property, without compensation, to the Virginia Department of Transportation ("VDOT") for road improvements adjacent to the Property. In April, 1998, Etheridge filed a final plat for Planter's Station, but no action had been taken on it before enactment by the City of the Uniform Development Ordinance ("UDO") on September 1, 1999.

---

[2] Planter's Station was to be an entrance to King's Landing and the first section to be built out.

The City's enactment of the UDO changed the zoning classification of land throughout the city of Suffolk. The UDO effectively rezoned all of the Property, other than the 10-acre commercial section, from "PD-H" to "Commerce Park" and "Office-Institutional."

After the City adopted the UDO, Etheridge requested a determination by the City's Zoning Administrator that it had vested rights in the PD-H zoning for the 154 acres. The Zoning Administrator determined that Etheridge had vested rights in the Planter's Station section, but not in the remaining portion of the 154 acres ("the Remainder"), which was the bulk of the Property. In effect, this determination meant that Etheridge could not develop the Remainder as residential property, but only as an office or commerce park, despite its contiguous location to Planter's Station.

Etheridge appealed the Zoning Administrator's decision to the BZA, which reversed the Zoning Administrator's determination and held that Etheridge had vested rights in the PD-H zoning designation for the Remainder. The trial court granted the City a writ of certiorari pursuant to Code § 15.2-2314 to review the BZA decision.

The trial court affirmed the BZA's decision finding that the 1988 rezoning was a "significant affirmative governmental act" under Code § 15.2-2307 upon which Etheridge reasonably

4

relied in good faith.  The trial court further found that Etheridge had expended substantial funds in diligent pursuit of the project and that those expenditures were for development of the entire Property.  This appeal by the City follows.

## II.  STANDARD OF REVIEW

> The decision of a board of zoning appeals is presumed to be correct on appeal to a circuit court; the appealing party bears the burden of showing that the board applied erroneous principles of law or that its decision was plainly wrong and in violation of the purpose and intent of the zoning ordinance.  Bd. of Zoning App. v. Bond, 225 Va. 177, 179-90, 300 S.E.2d 781, 782 (1983); Allegheny Enterprises v. Covington, 217 Va. 64, 67, 225 S.E.2d 383, 385 (1976).  A circuit court decision affirming a board of zoning appeals determination is also accorded this presumption of correctness on appeal to this Court.  Natrella v. Board of Zoning Appeals, 231 Va. 451, 456, 345 S.E.2d 295, 299 (1986).

Masterson v. Bd. of Zoning App., 233 Va. 37, 44, 353 S.E.2d 727, 732-33 (1987).

Our standard of appellate review is well established.  A circuit court's judgment is presumed to be correct and we will not set that judgment aside unless it appears from the record that the judgment is plainly wrong or unsupported by the evidence.  Ravenwood Towers, Inc. v. Woodyard, 244 Va. 51, 57, 419 S.E.2d 627, 630 (1992); Code § 8.01-680.

## III.  ANALYSIS

5

Prior to 1998, this Court's decisions had determined when landowners acquired vested rights in uses of their property where the zoning status of that property was changed to prohibit a previously permitted use.

> Privately held land is subject to applicable local zoning ordinances whether enacted before or after the property was acquired.  Generally, landowners have no property right in anticipated uses of their land since they have no vested property right in the continuation of the land's existing zoning status.  However, in limited circumstances, private landowners may acquire a vested right in planned uses of their land that may not be prohibited or reduced by subsequent zoning legislation.

Board of Zoning Appeals v. CaseLin Systems, Inc., 256 Va. 206, 210, 501 S.E.2d 397, 400 (1998) (internal citations omitted).

In 1998, the General Assembly enacted substantial changes to Code § 15.2-2307 that established certain criteria which, when satisfied, conclusively vest property rights in a landowner regardless of changes in an otherwise applicable zoning ordinance.

> [A] landowner's rights shall be deemed vested in a land use and such vesting shall not be affected by a subsequent amendment to a zoning ordinance when the landowner (i) obtains or is the beneficiary of a significant affirmative governmental act which remains in effect allowing development of a specific project, (ii) relies in good faith on the significant affirmative governmental act, and (iii) incurs extensive obligations or substantial expenses in diligent pursuit of the specific project in reliance on the significant affirmative governmental act.

6

Code § 15.2-2307. The case at bar presents our first examination of the legislative changes to Code § 15.2-2307.

The City avers in this appeal that the trial court was plainly wrong in applying the statutory criteria to the record evidence in this case. Specifically, the City contends that there was not sufficient evidence in the record that Etheridge was "the beneficiary of a significant affirmative governmental act . . . allowing development of a specific project." In the alternative, the City argues that Etheridge did not incur "extensive obligations or substantial expenses in diligent pursuit of the specific project." We disagree with both contentions.

A. Significant Affirmative Governmental Act

The trial court found that the 1988 rezoning of the Property to PD-H was a "significant affirmative governmental act." The City acknowledges that such a rezoning meets the new criteria in subsection (ii) of the second paragraph of Code § 15.2-2307 whereby "rezoning for a specific use or density" is "deemed to be a significant affirmative governmental act." However, the City contends that the 1988 rezoning was not for "development of a specific project" as required by subsection (i) of the Code section's first paragraph. Therefore, the City argues that no "deemed vesting" had occurred.

7

The City cites Town of Rocky Mount v. Southside Inv., Inc., 254 Va. 130, 487 S.E.2d 855 (1997), and Board of Supervisors of Chesterfield County v. Trollingwood Partnership, 248 Va. 112, 445 S.E.2d 151 (1994), for the proposition that development plans in great detail are required before a property owner can obtain vested rights in a land use classification. The City implies that these cases establish that Etheridge's King's Landing project is too vague to be deemed a "specific project" under Code § 15.2-2307, although the statute does not define "specific project" and the cases never mention that term.

Southside Inv., Inc., Trollingwood Partnership and other pre-1998 cases involved determining whether "a significant governmental act" had occurred with respect to the properties at issue which accorded vested land use rights to the landowners despite later zoning changes. In these cases a controlling factor was the issuance of a specific government land use authorization, beyond zoning, before vesting of a particular land use could be found. For instance, in Snow v. Amherst County Board of Zoning Appeals, 248 Va. 404, 448 S.E.2d 606 (1994), we held that "[t]he mere reliance on a particular zoning classification, whether created by ordinance or variance, creates no vested right in the property owner." 248 Va. at 408, 448 S.E.2d at 608-09. However, the plain language of current Code § 15.2-2307 now makes clear that vested rights accrue when

8

one of the six types of actions listed in the second paragraph of that Code section occurs.  Such acts are deemed to constitute "significant affirmative governmental acts allowing development of a specific project," including "rezoning for a specific use or density" as in the case at bar.

In Southside Inv., Inc., the landowner's property was rezoned to permit the construction of duplex residences.  In reliance on that zoning, the landowner constructed a street and utility infrastructure to develop both sides of the street and completed duplex construction on one side.  The landowner had not filed a site plan to develop the other side of the street when the zoning was changed to prohibit duplexes.  We found no vested rights in the prior zoning and deemed it dispositive that no "site plan or permit for the undeveloped portion of the property" had been issued prior to the change in zoning, therefore no significant governmental act had occurred as to that property.  254 Va. at 133, 487 S.E.2d at 857.

Similarly, the fact that no site plan had been filed, as required by the landowner's special use permit, was determinative in Trollingwood Partnership and we held that no vesting had occurred in the preexisting zoning.  The landowner's property was zoned for trailer park use which it was developing in sections.  The undeveloped parcel for which vested rights were asserted was subject to a special use permit which

9

contained a condition precedent that a site plan be filed.  The landowner had not filed a site plan when the zoning changed to prohibit a trailer park on the disputed property.  We found that no vesting had occurred because the required governmental act, approval of the site plan had not occurred.  248 Va. at 115-16, 445 S.E.2d at 153.

While these cases involved general plans of development, as opposed to a detailed ready-to-build plan, that factor was not the basis of the Court's decisions.  In Southside Inv., Inc., Amherst County Board of Zoning Appeals and Trollingwood Partnership we found that the respective property owners had no vested rights because no significant government act (as our precedent then defined it) had taken place since the subject land lacked site plan approval, a special use permit, or something similar.  The current statute's reference to "development of a specific project" is nowhere mentioned in these decisions and this concept was not discussed in our holdings.  Any distinction due to the general versus the specific nature of a landowner's development plans was unrelated to whether a significant governmental act, such as approval of a site plan, had occurred.

Nonetheless, the City argues that a "specific project" can only be found under Code § 15.2-2307 when "they would have filed site plans for the entire property."  No such requirement exists

10

in the statute and, for the reasons just enunciated, neither does it derive from our prior precedent.

The record reflects that the BZA and trial court were cognizant that the object of the 1988 rezoning was a specific tract known as King's Landing; it was not a general rezoning. The project was restricted to PD-H zoning and that approval specifically limited the number of residential units. Further, through the 1988 and 1994 master land use plans, the highway entrances, general roadways, and recreation areas were established, as well as designated residential and commercial use sections. The record supports the implied conclusion of the trial court and BZA that the rezoning was directed to a specific project.

Code § 15.2-2307 now specifically recognizes the type of zoning act taken by the City in 1988 as a significant affirmative governmental act creating a deemed vesting of land use rights. The record reflects that the zoning was specifically directed to an identifiable property and project. Thus, there was credible evidence in the record to support the trial court and BZA conclusions that the statutory requisite of "a significant affirmative governmental act . . . allowing development of a specific project" occurred. Therefore, we do not find the trial court's determination plainly wrong.

B.  Substantial Expenses in Diligent Pursuit

11

The City also assigns error to the trial court's determination that Etheridge was "in diligent pursuit" of the King's Landing project and incurred "substantial expenses" in that diligent pursuit. We find that the record supports the trial court's judgment and therefore do not find it plainly wrong.

## (i) Diligent Pursuit

The City contends Etheridge cannot claim diligence because it did practically nothing regarding the project from the 1988 rezoning until the 1994 rezoning and approval of the amended master land use plan. Had the UDO been adopted in 1994, instead of 1999, the City's argument would likely prevail. However, Etheridge's lack of diligence before 1994 is not dispositive since the BZA and trial court could consider all of Etheridge's development activity prior to the UDO zoning change. In that context, the trial court and BZA correctly found that Etheridge was reasonably diligent.

Whether due to the adjoining landowner's financial problems, general economic conditions, or whatever reason, Etheridge did not begin measurable steps to develop King's Landing until 1993, when its engineer evaluated the development options. From that point until adoption of the UDO, Etheridge undertook a series of activities to develop the whole Property, as the trial court's letter opinion reflects.

12

The record shows a train of regular, although not constant, events occurring in the period of some [14] years between the purchase of the property and the adoption of the UDO. I am unable to find that the evidence fails to support the conclusion of the BZA that Etheridge Manor exercised a "good faith, reasonable effort" toward the full development of the whole tract of land. I cannot find that the BZA was plainly wrong.

In reliance on the 1988 rezoning of the Property to PD-H, Etheridge undertook the 1993 engineering analysis and commenced development activities with the 1994 rezoning and amended master land use plan. The City approved the revised plan and rezoned the Property from high-density residential to an overall density of only four units per acre. Since, at that point, Etheridge was proceeding alone, it was necessary to reestablish the demarcation of the development from the land of the adjoining landowner through a survey and a re-subdivision plat which were filed and approved in 1995. Etheridge also completed a comprehensive traffic impact analysis for development of the entire Property in 1994, which was reviewed by the City and later approved by VDOT. In 1997, Etheridge deeded 1.129 acres to VDOT, without compensation, for road improvements to access the Property.

Etheridge undertook to develop a plan for recreational use, which the City approved in 1996, to dedicate certain recreational areas within the Property. Etheridge also developed the entrance phase, Planter's Station, with the

13

preliminary subdivision plats filed in 1996 and approved by the City. The final Planter's Station Subdivision plat, which included sewer, water, and storm drainage tied to development of the whole Property, was timely filed on April 17, 1998, but never acted upon by the City prior to the adoption of the UDO a year and a half later. Obviously, Etheridge was at a distinct disadvantage in efforts to proceed with development of the Remainder until the City approved the entrance phase of the subdivision.

Since the record reflects credible evidence sustaining the trial court's finding that Etheridge diligently pursued development of the entire Project (including the Remainder), we cannot say its decision was plainly wrong.

### (ii)  Substantial Expenses

The City does not contest the uncontroverted evidence in the record that Etheridge expended over $158,000 between 1993 and 1998 toward development of the Property. However, the City argues that most of these expenditures were limited to the development of Planter's Station and that there is no nexus between those expenses and the development of the Remainder. Therefore, the City maintains the expenditures were not substantial and could not vest land use rights in the PD-H zoning in the Remainder.

14

The trial court made specific findings, both in its letter opinion and order, that Etheridge's expenditures for the traffic study, conveyance to VDOT, the recreation plan, the engineering with regard to certain aspects of the Planter's Station plats, and the master land use plan were for the development of the entire Property, not exclusively for Planter's Station or the 10-acre commercial area. The record reflects credible evidence to support this finding.

In particular, the engineer for Etheridge opined, without contradiction, that the actions undertaken by Etheridge were for the benefit of the entire Property.

> The subdivision plats and construction drawings depicting Sections 1, 2 and 3 [Planter's Station] are designed to serve as part of the entire 480-unit project, and their scope greatly exceeds the needs of the initial area to be developed. The pump station is designed to serve the entire project. The BMP is larger than required for the initial sections, and is designed to tie into a larger system. The storm drainage system is calculated to handle more storm draining than that generated by the initial area. The interior road system is designed to serve traffic needs exceeding those generated by the initial area.

> The City has now changed the zoning on the balance of Etheridge Manor's residential property to Commerce Park, but has left Sections 1, 2 and 3 zoned PD-H. This makes no sense, since Sections 1, 2 and 3, standing alone, cannot be developed in an economically feasible manner. Because of the rezoning that has occurred, the infrastructure for Sections 1, 2 and 3 is overdesigned for those sections alone. The design and layout of Sections 1, 2 and 3 were totally dependent on the subsequent residential development contemplated by the development plan.

15

The City's counsel conceded as much at trial: "Admittedly, the infrastructure for those three areas (Planter's Station) was built big enough so that they could eventually hook it up to the full property when built out."

The record reflects credible evidence that Etheridge's expenditures were for development of the Property as a whole and verifies the determinations of the trial court and the BZA were not plainly wrong. Accordingly, we find no error in the trial court's judgment.

## IV. CONCLUSION

The record reflects credible evidence to support the findings of the BZA and the trial court that PD-H land use rights vested in Etheridge as to the Remainder. We find that neither the trial court nor the BZA was plainly wrong in determining that the PD-H zoning was a significant affirmative governmental act and that Etheridge incurred significant

expenditures in diligent pursuit of the King's Landing project.

Finding no error, we will affirm the trial court's judgment.[3]

Affirmed.

JUSTICE KEENAN, with whom CHIEF JUSTICE HASSELL and JUSTICE KOONTZ join, concurring in part, dissenting in part.

Contrary to the language of Code § 15.2-2307, the majority's holding permits the creation of a vested property right based on general conceptual land use plans accompanying a rezoning, rather than on evidence of a "specific project" as required by the statute. In addition, contrary to the statutory requirement that a landowner also act in "diligent pursuit" of a "specific project" to secure a vested property right, the majority allows actions taken five or more years after the relevant governmental act to constitute such "diligent pursuit." These holdings effectively alter the statute and permit the establishment of vested rights that do not comply with the terms and conditions provided by the General Assembly in Code § 15.2-

---

[3] The City also assigned error claiming the trial court erred in finding that approval of the preliminary plat for Planter's Station created vested rights in Etheridge as to the Remainder. We do not read the trial court's decision to make such a holding. Neither the trial court's letter opinion nor its order indicated any causative nexus between approval of the plat for Planter's Station and the vesting of rights in the Remainder. The trial court noted the vested rights of Etheridge in Planter's Station were the same vested rights it acquired in the Remainder, but there was no cause and effect relationship. Accordingly, we do not address this assignment of error as it was based on the City's erroneous reading of the trial court's decision.

2307. Therefore, I respectfully dissent from that part of the majority's opinion affirming Etheridge's vested rights in the portion of the 154-acre tract not covered by the Planter's Station subdivision plat.

Code § 15.2-2307 provides, in relevant part that:

"[A] landowners' rights shall be deemed vested in a land use and such vesting shall not be affected by a subsequent amendment to a zoning ordinance when the landowner (i) obtains or is the beneficiary of a significant affirmative governmental act which remains in effect allowing development of a specific project, (ii) relies in good faith on the significant affirmative governmental act, and (iii) incurs extensive obligations or substantial expenses in diligent pursuit of the specific project in reliance on the significant affirmative governmental act.

For the purposes of this section and without limitation, the following are deemed to be significant affirmative governmental acts allowing development of a specific project: (i) the governing body has accepted proffers or proffered conditions which specify use related to a zoning amendment; (ii) the governing body has approved an application for a rezoning for a specific use or density; (iii) the governing body or board of zoning appeals has granted a special exception or use permit with conditions; (iv) the board of zoning appeals has approved a variance; (v) the governing body or its designated agent has approved a preliminary subdivision plat, site plan or plan of development for the landowner's property and the applicant diligently pursues approval of the final plat or plan within a reasonable period of time under the circumstances; or (vi) the governing body or its designated agent has approved a final subdivision plat, site plan or plan of development for the landowner's property.

In the present case, the trial court determined that the 1988 rezoning was a "significant governmental act," within the

18

meaning of Code § 15.2-2307, and held that Etheridge took sufficient steps to secure a vested right in the entire property by expending funds relative to the development of that "entire tract." I disagree with the majority's analysis, which largely adopts the trial court's reasoning, for three basic reasons.

First, the majority states that the 1988 rezoning was "specifically directed" to "an identifiable property and project" but does not explain how the rezoning "allow[ed] development of a specific project," as required by the language of Code § 15.2-2307. Instead, the majority effectively concludes that this statutory requirement was met because the 1988 rezoning involved a particular tract of land, which was depicted in conceptual land use plans.

The 1988 rezoning, however, did not allow development of any specific project, but merely changed the zoning of Etheridge's property from "Rural Residential" to "PD-H." Moreover, this rezoning, on which the majority relies to establish a vested right under Code § 15.2-2307(ii), was not a "rezoning for a specific use or density" within the meaning of that provision because the rezoning did not mandate any particular use of the property and did not limit development to any specific density. Instead, the 1988 rezoning permitted a wide variety of densities, as illustrated by the 1988 Master

19

Plan (the 1988 plan).[*]  Further, the 1988 plan showed only
general locations for various basic types of development.

The General Assembly's intended meaning of the term
"specific project" is illustrated in the second paragraph of
Code § 15.2-2307, which provides several examples of actions
that "are deemed to be significant affirmative governmental acts
allowing development of a specific project."  On brief and at
oral argument in this appeal, Etheridge relied on category (v)
of the second paragraph, with its reference to a "plan of
development," in support of its vested rights contention.
Etheridge asserted that the 1994 Conceptual Land Use Plan (the
1994 plan), which showed only general use categories for the
property, was a "plan of development" within the meaning of
category (v).  Thus, Etheridge argued that the 1988 rezoning and
adoption of the 1994 plan satisfied the statutory requirement of
demonstrating "a significant affirmative governmental act . . .
allowing development of a specific project."

The majority does not address category (v), which is
central to an analysis of this vested rights claim.  With
respect to category (v), I would hold that neither the 1988 nor
the 1994 plan qualifies as a "plan of development" under that

---

[*]See the attached copy of the 1988 plan.

category for purposes of demonstrating the existence of a "specific project."

Under the terms of category (v), before such a plan can be considered evidence of a "specific project," the landowner must have "diligently pursue[d] approval of the final plat or plan within a reasonable period of time under the circumstances." By their very nature, the 1988 and 1994 plans were conceptual in nature and were not subject to further approval as a "final plat or plan" detailing the manner in which the property would actually be developed.

The conceptual nature of these plans was emphasized by Etheridge's planning consultant in an exhibit received in evidence in this case. In that document, the consultant observed that the "[l]and uses proposed for the development will be <u>generally</u> located as indicated on the [1988] Plan." Thus, Etheridge's own evidence demonstrates that the 1988 and 1994 plans cannot qualify as a "plan of development" creating a "specific project," within the meaning of category (v) in Code § 15.2-2307.

The only evidence of a "specific project" in the present record is the preliminary subdivision plat for Planter's Station, which relates to only a portion of Etheridge's entire tract. Manifestly, this plat cannot establish the existence of a "specific project" for the remaining portion of the tract not

21

covered by the plat. Thus, I would conclude that although the 1988 rezoning was a significant affirmative governmental act within the meaning of Code § 15.2-2307, that rezoning was not an act that "allow[ed] development of a specific project" encompassing Etheridge's entire property.

My second disagreement with the majority's analysis is that it effectively accords Etheridge's entire tract the status of a "specific project" simply because certain actions taken by Etheridge ultimately could benefit the entire tract. Any such benefit to the entire tract is purely conjectural, however, because no specific plan has been approved for its development. Given the absence of any specific plan of development for the entire site, development beyond the boundaries of the preliminary subdivision plat may not ever occur in any manner now being evaluated by Etheridge. I cannot conclude that the General Assembly intended that the term "specific project" in Code § 15.2-2307 be applied in this manner to allow the creation of a vested right that is so wholly indefinite in both time and scope.

My third disagreement with the majority's analysis is that the vested right accorded Etheridge effectively negates the statutory requirement that any such right be based on the "diligent pursuit" of a "specific project." In applying the term "diligent pursuit," I would assign the word "diligent" its

22

usual and common meaning.  Fritts v. Carolinas Cement Co., 262 Va. 401, 405, 551 S.E.2d 336, 339 (2001); Murphy v. Norfolk Cmty. Servs. Bd., 260 Va. 334, 339, 533 S.E.2d 922, 925 (2000). That meaning imparts "steady, earnest, attentive, and energetic application and effort."  See Webster's Third New International Dictionary 633 (1993).  The uncontested facts of record show that Etheridge did not begin to make any application or effort in pursuit of any project until five years after the 1988 rezoning.  Thus, if Etheridge's actions in 1993 and thereafter are sufficient to satisfy the statutory term "diligent pursuit," this term will place no practical or meaningful restriction on the acquisition of vested rights, in contravention of the clear language of Code § 15.2-2307.

Accordingly, I would hold that the trial court's application of Code § 15.2-2307 was plainly wrong, and that Etheridge did not have a vested right in the portion of its property not covered by the Planter's Station preliminary subdivision plat.  I would enter final judgment reversing this part of the trial court's judgment, and affirming the part of the court's judgment holding that Etheridge had vested rights in the portion of its property included in the Planter's Station subdivision plat.

23

# ORIGINAL MASTER PLAN



CONCEPTUAL LAND USE & CIRCULATION PLAN
## KING'S LANDING
CHUCKATUCK BOROUGH   SUFFOLK VA.

ORIGINAL LAND USE PLAN - KINGS LANDING

APPROVED 1988

000244